Michael IVES and Tammy Ives, Plaintiffs-Respondents,

RHINELANDER PAPER CO. GROUP HEALTH PLAN for Hourly Employees Sponsored by Rhinelander Paper Company, Inc., Plaintiff-Appellant-Petitioner,†

v.

COOPERTOOLS, a Division of Cooper Industries, Inc.; Alias Insurance Company No. 1; Cooper Industries, Inc.; Alias Insurance Company No. 2; Berns Enterprises, Inc. d/b/a Rhinelander Hardware; The Aetna Casualty & Surety Company; McGraw-Edison Company; and Alias Insurance Company No. 4, Defendants.

Supreme Court

*No. 95–0932. Oral argument September 5, 1996.—Decided February 28, 1997.*

(Also reported in 559 N.W.2d 571.)

†Motion for reconsideration denied April 16, 1997.

For the plaintiff-appellant-petitioner there were briefs by *Matthew E. Yde* and *Ruder, Ware & Michler, S.C.*, Wausau and oral argument by *Matthew E. Yde*.

For the plaintiffs-respondents there was a brief by *D.J. Weis* and *Habush, Habush, Davis & Rottier, S.C.*, Rhinelander and oral argument by *D.J. Weis*.

Amicus curiae brief was filed by *Mark L. Thomsen* and *Cannon & Dunphy, S.C.*, Brookfield for the Wisconsin Academy of Trial Lawyers.

Amicus curiae brief was filed by *Terry J. Booth* and *Fellows, Piper & Schmidt*, Milwaukee for the Wisconsin Health Insurers.

¶ 1. PER CURIAM. This is a review of a published decision of the court of appeals,[1] vacating the order of the Circuit Court for Oneida County, Robert E. Kinney, Judge. The question in this case is whether a subrogated insurer is entitled to reimbursement on its lien when the injured plaintiffs settle with the alleged tortfeasors before trial for an amount less than their total damages. We unanimously conclude that the court of appeals erred in its holding that there must be a determination of Michael Ives' contributory negligence, if any, before the question of reimbursement to Rhinelander can be considered. However, we are evenly divided on the reasons for this conclusion.

¶ 2. The published opinion of the court of appeals here should not stand when we unanimously agree that it does not state the law in Wisconsin. The court in *State v. Gustafson*, 121 Wis. 2d 459, 462, 359 N.W.2d 920, *cert. denied*, 471 U.S. 1056 (1985), affirmed a con-

---

[1] *Ives v. Coopertools*, 197 Wis. 2d 937, 541 N.W.2d 247 (Ct. App. 1995).

viction where a majority of the court concluded there was prejudicial error, but no majority agreed on a particular error. There, a reversal would have sent the matter back for a new trial, but without providing adequate guidance to the circuit court. *Id.* at 462, citing *Will of McNaughton,* 138 Wis. 179, 118 N.W. 997, 120 N.W. 288 (1909). Here, however, we are in agreement as to the proper resolution of the contributory negligence question. Thus, despite our even division on the rationale for our decision, we affirm the order of the circuit court.

■

¶ 3. The situation at hand is unlike the case of a tie vote on a certification or bypass. In such instance, if we allow the circuit court's decision to stand the parties have in effect been denied a full appellate review and opinion. *State v. Richard Knutson, Inc.,* 191 Wis. 2d 395, 396, 528 N.W.2d 430 (1995). Here, the parties have had the opportunity of full review by both this court and the court of appeals. Our division on reasoning simply means that the analyses of the two concurrences have no precedential value. *State ex rel. Thompson v. Jackson,* 199 Wis. 2d 714, 719, 546 N.W.2d 140 (1996) (citing *State v. Elam,* 195 Wis. 2d 683, 685, 538 N.W.2d 249 (1995) (a majority of justices must have agreed on a particular point for it to be considered the opinion of the court).

¶ 4. Chief Justice Shirley S. Abrahamson, Justice William A. Bablitch and Justice Janine P. Geske would vote to reaffirm the made whole rule enunciated in *Garrity v. Rural Mutual Ins. Co.,* 77 Wis. 2d 537, 253 N.W.2d 512 (1977) and *Rimes v. State Farm Mut. Auto. Ins. Co.,* 106 Wis. 2d 263, 316 N.W.2d 348 (1982), but would overrule *Sorge v. National Car Rental System, Inc.,* 182 Wis. 2d 52, 57, 512 N.W.2d 505 (1994). This

rule focuses on what an injured plaintiff has lost, and not on what an injured plaintiff can legally receive.[2] Justices Donald W. Steinmetz, Jon P. Wilcox and N. Patrick Crooks would conclude that, in the case of a settlement before trial, the circuit court should assess the subrogated insurer's rights of recovery at a rate equal to the percentage of the plaintiff's recovery in relation to his or her gross damages. Attorney's fees and costs may be handled on a pro rata basis as well, if the insurer is not represented by counsel.[3] Justice Ann Walsh Bradley did not participate.

¶ 5. *By the Court.*—For the reasons set forth, the decision of the court of appeals is reversed, and the order of the circuit court denying Rhinelander's claim for reimbursement is affirmed.

¶ 6. JANINE P. GESKE, J. (*concurring*). In our opinion, Rhinelander is not entitled to reimbursement of its lien because the circuit court determined that the Iveses were not made whole by their settlement with the alleged tortfeasors.[1] We start with a recitation of the facts as presented to us.

## Facts and Procedural History

¶ 7. In November 1989, Michael Ives sustained severe injuries when he fell out of a tree after his home-made deer stand collapsed. Rhinelander Paper Company Group Health Plan for Hourly Employees Sponsored by Rhinelander Paper Company, Inc.

---

[2] See attached concurrence written by Justice Geske. This concurrence also sets out the facts of this case.

[3] See attached concurrence written by Justice Steinmetz.

[1] Chief Justice Shirley S. Abrahamson and Justice William A. Bablitch join in this concurrence.

(Rhinelander), paid $132,292 in medical expenses Michael incurred because of the accident.[2] Michael and Tammy Ives sued the manufacturer and seller of a double-end snap cap Michael used to hold his deer stand in place, and also named the insurers of the manufacturer and seller (hereinafter, collectively, "the defendants"). The Iveses alleged that the double-end snap cap failed, causing the deer stand to collapse. Rhinelander employed counsel to participate in the Iveses' suit and to prosecute its subrogation claim for payment of Michael's medical expenses.[3]

¶ 8. Approximately one week before trial, the Iveses entered into a settlement with the defendants. The defendants paid $261,250 to fully settle the $1.5 million claim that included the past medical expenses previously paid by Rhinelander. This settlement extinguished Rhinelander's claim against the defendants. *Schulte v. Frazin*, 176 Wis. 2d 622, 634–35, 500 N.W.2d 305 (1993). The Iveses then requested a post-settlement subrogation hearing[4] to determine their potential liability, if any, to Rhinelander out of the

_____

[2] The parties make no claim that the insurance coverage provided by Rhinelander was part of a self-funded ERISA plan. Subrogation provisions of a self-funded ERISA plan trump state subrogation rules. *FMC Corp. v. Holliday*, 498 U.S. 52, 58–65 (1990). According to the pleadings, the original subrogated plaintiff, Employers Insurance Company, sold health insurance policies for a premium, and had issued a policy to Michael and Tammy Ives, pursuant to which it may have made payment of medical bills relating to the accident.

[3] In this case, counsel agreed at oral argument that this is a claim for contractual subrogation. The insurance policy under which Rhinelander makes its claim, however, is not part of the record before this court.

[4] Following the decision in *Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis. 2d 263, 316 N.W.2d 348 (1982), this type of

settlement proceeds. For purposes of the post-settlement subrogation hearing, the Iveses and Rhinelander stipulated to the following facts:

1. Plaintiffs' total damages as a result of injuries to Plaintiff MICHAEL IVES following his fall from a deer stand on or about November 10, 1989, are 1.5 million dollars.

2. That the defendants' payment of $261,250.00 in full settlement of all personal injury and property damage claims arising out of Plaintiff MICHAEL IVES' fall from a deer stand on or about November 10, 1989, is full-value for the Plaintiffs' claims based on the following factors:

a. Liability difficulties; and

b. Uncertainty of successor corporate liability on the Coopertools defendants.

3. That due to liability problems and the uncertainty of successor corporate liability, the Plaintiffs accepted 17.42 percent of their total damages arising out of the November 10, 1989, accident.

4. That Plaintiffs' decision to accept 17.42 percent of their total damages was *not* based on insufficient insurance coverage or the unavailability of funds on the part of the defendants to satisfy a 1.5 million dollar judgment.

5. That Rhinelander has paid medical expenses ($128,487.40) and accident and sickness benefits ($3,804.60) relating to this accident in the amount of $132,292.00.

¶ 9. Relying upon this court's decision in *Rimes*, 106 Wis. 2d 263, the circuit court held that the Iveses

---

post-settlement subrogation hearing came to be known as a "*Rimes* hearing."

were not made whole. The court considered the stipulated facts, and found that the settlement did not compensate the Iveses for their entire actual loss. Further, the circuit court concluded that the equities of the case favored the Iveses. Thus, Rhinelander was not entitled to reimbursement of its subrogated lien.

¶ 10. The court of appeals vacated the order of the circuit court. Relying upon *Sorge v. National Car Rental System, Inc.*, 182 Wis. 2d 52, 512 N.W.2d 505 (1994), the court of appeals remanded for a determination of Michael Ives' percentage of contributory negligence. Because the Iveses stipulated that they received 17.42 percent of their damages in the settlement, the appellate court calculated that the settlement would make the Iveses whole only if Michael was 82.58 percent or greater contributorily negligent. The court of appeals further concluded that Rhinelander had a right of priority in any money collected over the amount of the Iveses' total damages, discounted for the percentage of Michael's contributory negligence, up to the amount of benefits paid. The court held that a settlement discounted for factors other than the plaintiff's contributory negligence does not make the insured whole. Finally, the court of appeals held that the Wis. Stat. § 895.045 (1989–90) bar to recovery in negligence actions has no application to the equitable resolution of a subrogation dispute.[5]

---

[5] Wis. Stat. § 895.045 (1989–90) provides:

Contributory negligence. Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence resulting in death or in injury to person or property, if such negligence was not greater than the negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering.

## Standard of Review

¶ 11. In this case we are asked to determine the rights of the insured and the subrogated insurer when the insured has settled with the defendants without involving the subrogated insurer. This case presents a question of law that we decide without deference to the lower courts. *Schulte v. Frazin*, 176 Wis. 2d 622, 628, 500 N.W.2d 305 (1993). In doing so, we apply principles of equity to the facts before us. *Beacon Bowl, Inc. v. Wisconsin Electric Power Co.*, 176 Wis. 2d 740, 776, 501 N.W.2d 788 (1993).

## Arguments of the Parties

¶ 12. Rhinelander asserts that the Iveses have been made more than whole by their settlement with the tortfeasors. The Iveses settled for an amount equaling 17.42 percent of their stipulated total damages of $1.5 million. According to their stipulation, the settlement of $261,250.00 was full-value[6] and compensated the Iveses for their personal injury and property damage claims arising out of Michael Ives' fall. In light of that, Rhinelander proposes a formula whereby it would receive in reimbursement 17.42 percent of its lien. Such a formula incorporates the percentage of the stipulated total damages that the Iveses received. Under

All further references are to the 1989–90 statutes unless otherwise noted.

[6] This court is not called upon by the parties to interpret the meaning of "full-value" as used in their stipulation. The circuit court also refused to interpret that term. For purposes of this concurrence, we read the terms of the entire stipulation to recognize that the plaintiffs and alleged tortfeasors decided to settle all of the plaintiffs' claims for damages arising from this accident, rather than assume the risks facing each of them at a trial.

Rhinelander's theory this formula would prevent a double recovery of that percentage by the Iveses. Rhinelander alternatively argues for a full-blown evidentiary determination of contributory negligence.

¶ 13. Rhinelander asserts that the Iveses have been more than made whole, in fact, that their recovery has greatly exceeded the amount of damages they were legally entitled to recover. Rhinelander's assertion is premised on the assumption that, had there been an actual trial, Michael Ives would have been found at least 50% negligent. This is only an assumption, however, because at the *Rimes* hearing in this case the circuit court did not make a specific finding as to liability. Without hearing any evidence, Judge Kinney merely remarked that the most likely result would be a jury finding that the incident here was a "pure accident." Judge Kinney also acknowledged that this remark was speculation on his part.

¶ 14. The Iveses contend that the pre-trial release they executed does not make them whole because it does not compensate them for all of the elements of their damages under *Rimes*. They seek to distinguish the settlement agreement and stipulation they entered into here from the agreement and stipulation in an earlier subrogation case, *Sorge*, 182 Wis. 2d 52. There the plaintiff acknowledged that the settlement amount, which took into account a deduction for her contributory negligence, was all that she was legally entitled to receive. The Iveses agree, based on *Sorge*, that when a settling plaintiff receives all that he or she is legally entitled to receive, the plaintiff meets the made whole test of *Rimes*.

¶ 15. Finally, the Iveses ask this court to conclude that the circuit court here did all that it needed to decide the made whole question. The court relied on the

stipulation between the parties and "on its knowledge of the evidentiary facts derived from having done extensive work on the file prior to the *Rimes* hearing," weighed the equities, and then held that the Iveses had not been made whole. Respondents' brief at 5.

## Purpose and History of Subrogation

¶ 16. Our analysis leads us to believe that the made whole doctrine should be reaffirmed. As part of our analysis we review the development of the subrogation doctrine. Subrogation has its genesis in the principle of indemnity. Although an insured is entitled to indemnity from its insurer pursuant to coverage provided under a policy of insurance, the insured is entitled only to be made whole, not more than whole. Subrogation prevents an insured from obtaining one recovery from the insurer under its contractual obligations and a second recovery from the tortfeasor under general tort principles. The subrogation doctrine also advances an important policy rationale underlying the tort system. It forces a wrongdoer who has caused a loss to bear the burden of reimbursing the insurer for indemnity payments made to its insured as a result of the wrongdoer's acts and omissions. *See* Elaine M. Rinaldi, *Apportionment of Recovery Between Insured and Insurer in a Subrogation Case*, 29 Tort. & Ins. L.J. 803 (1994).

¶ 17. Another author traces the development of subrogation from cases involving the liability of a surety. Harriette R. Flinn, *Subrogation - Insured Must Be Paid In Full For Loss Before Insurer Is Entitled To Subrogation Against Tortfeasor*, 10 Mem. St. U. L. Rev. 161, 162–63 (1979). Where an insurer pays its full obligation under the policy, but that amount is less than the insured's entire loss, the insurer's liability is none-

theless limited by the policy amount. *Id.* The question then arose whether the common law which developed to protect creditors in a surety situation should apply to the situation where the insurer has already paid in full compliance with his policy but the insured's loss exceeds the insurance payment. In the absence of an express agreement to the contrary, the traditional rule has been that the common law rule prevails and the insurer has no subrogation rights until the insured is made whole, that is, until the insured has been compensated for the entire loss sustained. Author Flinn also noted, however, that it has become standard practice for indemnity contracts to contain express provisions subrogating the insurer who has paid a claim to all of the rights of the insured against a wrongdoer. *Id.*

¶ 18. In 1977, this court held that a subrogation clause in an indemnity insurance contract did not change the common law rule that a subrogated insurer has no right to share in the funds recovered from the tortfeasor until the insured is made whole. *Garrity v. Rural Mutual Ins. Co.*, 77 Wis. 2d 537, 546–47. The insureds suffered a fire loss to their dairy barn and other property, for which they were paid the limits under their Rural Mutual fire insurance policy. *Id.* at 539. The parties stipulated that the insureds' total loss exceeded the fire policy limits. *Id.* In other words, the Garritys were not made whole. *Id.* at 543. The Garritys then sued the owners of a feed mill, alleging that negligent operation of a feed truck caused the fire. *Id.* at 539. The alleged tortfeasors were also insured by Rural Mutual for liability coverage limits of $25,000. *Id.*

¶ 19. The Garritys executed a subrogation receipt under their fire policy granting to Rural Mutual a right of recovery against any party found liable for

their loss. Because Rural Mutual also insured the alleged tortfeasors, it sought a declaration of its rights of subrogation against itself. *Id.* at 539–40.

¶ 20. The circuit court entered an interlocutory judgment granting Rural Mutual the right of priority in any recovery of money from defendants or their insurer, up to the amount paid under the fire policy. *Id.* at 540. Under that ruling, Rural Mutual would not have had to pay any more money to plaintiffs even if its insured tortfeasors were found negligent. *Id.*

¶ 21. This court disagreed with the circuit court ruling which incorrectly gave the contractual language primacy over the common law rule that an insured must be made whole before the insurer may recover from the tortfeasor. *Id.* at 541. The court focused on the distinction between the right of recovery provided in the subrogation clause and the common law rule dictating priority of payment to an insured who has not been made whole. *Id.* at 544–46. In *Garrity*, the court relied upon the following rationale for the made whole rule: "[t]he owner of the policy should be first to make good his own loss; where either the insurer or the insured must to some extent go unpaid, the loss should be borne by the insurer for that is a risk the insured has paid it to assume." *Id.* at 542.[7] In other words, the insurer has no right of reimbursement against the insured where

---

[7] Although Justice Steinmetz' concurrence criticizes an alleged reliance on *Essock v. Mawhinney*, 3 Wis. 2d 258, 88 N.W.2d 659 (1958) for the made whole theory in *Garrity v. Rural Mut. Ins. Co.*, 77 Wis. 2d 537, 253 N.W.2d 512 (1977), neither *Garrity* nor *Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis. 2d 263, 316 N.W.2d 348 (1982) even cite to *Essock. Essock* stands for the proposition that mere uncertainty as to the amount of damages does not preclude a right of recovery. *See, e.g., Hein v. Torgerson*, 58 Wis. 2d 9, 18–19, 205 N.W.2d 408

the total compensation received by the insured is less than his loss. *Id.* at 543. *Garrity* involved only a claim for property damage.

¶ 22. As the *Garrity* decision demonstrates, subrogation rights are common under policies of property or casualty insurance, wherein the insured sustains a fixed financial loss and the purpose is to place that loss ultimately upon the wrongdoer. 3 Appleman, *Insurance Law and Practice* s 1675, at 495 (1967). The more recent disputes concerning the propriety of subrogation reimbursement have occurred in cases of personal injury. In *Rimes*, this court reviewed a procedure applying the made whole inquiry to a personal injury case. 106 Wis. 2d 263. There the majority reluctantly approved the circuit court's use of a post-settlement evidentiary "mini-trial" to determine the plaintiffs' total amount of damages and apportionment of negligence between plaintiff and tortfeasors. *Id.* at 276–79.

¶ 23. In *Rimes*, the plaintiff was injured in an automobile accident involving three other vehicles. *Id.* at 265. The plaintiff ultimately dismissed one of the

---

(1973); *Hope Acres, Inc. v. Harris*, 27 Wis. 2d 285, 298, 134 N.W.2d 462 (1965).

Justice Steinmetz' concurrence is also critical of the *Garrity* court's failure to rely on Wisconsin precedent in adopting the made whole theory. The issue in *Garrity* was one of first impression in Wisconsin. Any time there is a case of first impression, we look to other state jurisdictions and treatises for guidance. At the time the *Garrity* decision was published it was consistent with the rule in several other states and with the interpretations of commentators such as 4 *Williston on Contracts*, sec. 1269 (Third ed. 1967) and *Couch on Insurance*, sec. 61.61 (2d ed. 1968). For the past twenty years, *Garrity* has been precedent in this state. Many cases, including the decision in *Sorge v. National Car Rental System, Inc.*, 182 Wis. 2d 52, 62, 512 N.W.2d 505 (1994), have cited to or relied upon *Garrity*.

defendants with prejudice, and on the second day of trial accepted settlement from the insurers of the remaining vehicle owners. *Id.* at 266–67. The settlement included the $50,000 policy limits of one policy, and $75,000 out of a total $300,000 limit from the other policy. *Id.* at 267.

¶ 24. The plaintiffs and their subrogated insurer then agreed to seek a "trial" concerning the insurer's claim to reimbursement for medical payments previously made on behalf of the injured plaintiff. *Id.* at 267. The circuit court held a two-day hearing, found no contributory negligence and found total damages of over $300,000. *Id.* at 268–69. The circuit court held that only the amount of total damages would make the plaintiffs whole. Because the settlement amount fell far short, the subrogated insurer was not entitled to reimbursement. *Id.* at 269.

¶ 25. On appeal, the insurer asserted that the plaintiffs' voluntary settlement and release in *Rimes* was the legal equivalent of being made whole. This court disagreed for several reasons. *Id.* at 273. There was no evidence of an acknowledgment by the plaintiffs that the settlement during trial had made them whole. *Id.* at 267–68, 273. No recital in the plaintiffs' stipulation evidenced an acknowledgment of wholeness. *Id.* at 273. The court particularly noted that the plaintiffs, in their general release, set aside an escrow fund in the amount of the insurer's subrogated claim. That escrow fund indicated to us that the plaintiffs did not consider themselves whole. *Id.* The court therefore refused to assume that the grantor of a release acknowledged full reimbursement for the wrong done. *Id.* By their settlement with the tortfeasors, the *Rimes* plaintiffs gave up their right of action against the defendants for consideration that may or may not have made them whole. *Id.*

¶ 26. Only where an injured party has received an award by judgment or otherwise that pays for all of his or her elements of damages, including those for which the insured has already been indemnified by an insurer, is there a right to subrogation reimbursement. *Id.* at 275.[8] In light of the facts in *Rimes*, and in accordance with the general principles of subrogation stated in *Garrity*, this court concluded that the settlement in *Rimes* did not make the plaintiffs whole. *Id.* at 276.

¶ 27. Four years later, this court cautioned that the made whole principle of *Rimes* and *Garrity* was not absolute. *Vogt v. Schroeder*, 129 Wis. 2d 3, 16–17, 383 N.W.2d 876 (1986). There we were asked, prior to a trial, to balance the equities between an underinsurer who had paid benefits and an underinsured tortfeasor who had not paid for the damages he caused. *Id.* at 17. In doing so, the court recognized the equitable principle derived from *Garrity* that "the wrongdoer should be responsible for his conduct and not be allowed to go scot-free by failing to respond in damages while another, an indemnitor for the injured party, is required to do so." *Id.* at 13. The court concluded that once the injured plaintiff's underinsurance carrier paid at least the maximum amount obtainable from the underinsured motorist's carrier, the underinsurer could assert a subrogation reimbursement claim

---

[8] The made whole rule of *Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis. 2d 263, 316 N.W.2d 348 (1982) has become the default federal common law rule in the Seventh Circuit where an employee benefit plan fails to designate priority rules or provide its fiduciaries the discretion necessary to construe the plan accordingly. *Schultz v. Nepco Employees Mut. Benefit*, 190 Wis. 2d 742, 751–52, nn.9–10, 528 N.W.2d 441 (Ct. App. 1994), citing *Sanders v. Scheideler*, 816 F. Supp. 1338 (W.D. Wis. 1993), *aff'd by unpublished order*, 25 F.3d 1053 (7th Cir. 1994).

against the tortfeasor's insurer. The outcome in *Vogt* was based on this court's policy of promoting prompt settlement, and served to put the burden of final payment on the tortfeasor for the amount in excess of his coverage. *Id.* at 19. Under *Vogt*, a plaintiff can take advantage of the defendant's settlement offer and an underinsurer can protect its right to subrogation reimbursement. *Id.* at 23.

¶ 28. In 1993 the court considered a claim for subrogation where the insurer sought subrogation recovery against the tortfeasor regardless of the answer to the made whole inquiry. *Schulte v. Frazin,* 176 Wis. 2d 622, 628. In *Schulte,* the injured plaintiffs and defendants entered into a $2,460,000 settlement of a medical malpractice claim. *Id.* at 626. The settlement agreement did not provide for any payment to the subrogated carrier. *Id.* The settlement agreement did provide that the plaintiffs would indemnify the defendants for any liability arising out of the incident. *Id.* at 626–27. Application of the subrogation principle depended upon the equities, and thus upon the facts at hand. *Id.* at 631. This court also recognized that any determination of rights to subrogation reimbursement must consider the realistic competition between an insured and the subrogated insurer for limited settlement funds. *Id.* at 633.

¶ 29. The ultimate holding in *Schulte* reiterated the *Rimes* rule and affirmed the need for a made whole inquiry. However, we also concluded in *Schulte* that where the plaintiffs settled with defendants, indemnified the tortfeasors and moved for a subrogation hearing, the plaintiffs not only extinguished their claim against the tortfeasors but also extinguished the subrogated insurer's claim against the tortfeasors. 176 Wis. 2d at 634–35.

¶ 30. Not long after *Schulte* this court confronted the effect of contributory negligence on the made whole inquiry. *Sorge*, 182 Wis. 2d 52. There, the parties asked us to determine whether an insurer had a right to subrogation reimbursement when the plaintiff settled before trial. Unlike the plaintiff in *Rimes*, however, the *Sorge* plaintiff admitted contributory negligence. *Id.* at 55. She settled for what she later stipulated would have been her recovery following a jury trial. *Id.* at 55–56.

¶ 31. It is clear that the *Sorge* case was brought to this court based on stipulated facts, and not following a trial or the traditional *Rimes* hearing. In our view, it is unfortunate that the *Sorge* stipulation did not provide us with the usual facts necessary for a made whole determination. The stipulation did not identify the amount of the plaintiff's total damages, that is, the amount that would have made her whole under *Rimes* and *Garrity*. Alternatively, the stipulation did not identify the particular percentage of plaintiff Sorge's negligence. Sorge's attorney represented that the stipulation did, however, provide that "Ms. Sorge settled the case for an amount less than the total damages that she had, minus the total amount of the subrogated—the subrogated carrier's liens, but in an amount which would have been equal to what she would have received from a jury after a reasonable deduction for—for her contributory negligence." Brief for Petitioner at App. F–4, *Sorge*, 182 Wis. 2d 52.[9]

---

[9] There appears to be confusion in the *Sorge* record as to what damages the settlement amount included. The attorney for the subrogated insurer claimed at the same hearing at which the plaintiff's attorney recited the stipulation, that "[t]he medical expenses were paid on her behalf by the medical providers, and then she received a settlement which included in it the

¶ 32. Although the *Rimes* and *Garrity* decisions did not apply the made whole doctrine to a contributorily negligent injured person, in *Sorge* this court tried to satisfy the underlying policies behind both the doctrine of subrogation reimbursement and the made whole rule of those earlier cases. *Sorge* said that a contributorily negligent injured person is made whole such that her insurers may assert their reimbursement rights when the insured has been compensated for all of her losses less the amount corresponding to her contributory negligence. *Sorge*, 182 Wis. 2d at 58, 62.

¶ 33. This court ultimately concluded in *Sorge* that an injured plaintiff who is at most 50 percent negligent must reimburse the insurance company for the share of the medical bills it paid corresponding to the tortfeasor's share of negligence. *Id.* at 61–63. As we now read *Sorge*, that conclusion would lead to the following result: for example, if a jury finds a plaintiff to be 10 percent contributorily negligent, the plaintiff's net award is 90 percent of his or her awarded damages. Likewise, the subrogated insurer would recover 90 percent of the subrogated medical expenses rather than the full 100 percent. The *Sorge* court wrote that if no subrogated amounts were to be paid back until the insured had received 100 percent of his or her total damages, a plaintiff who conceded contributory negli-

---

medical expenses again. She's paid twice. *Rimes* wants to avoid that." Brief for Petitioner at App. F–9. Attorney Stingl later argued, "Judge, I don't think the reduction—I don't think there's any stipulation anyplace that said the reduction is because of the medical expenses. . . .What was said was the reduction was for her own negligence." Brief for Petitioner at App. F–12, *Sorge v. National Car Rental System, Inc.*, 182 Wis. 2d 52, 512 N.W.2d 505 (1994). It does not appear from the *Sorge* record that this dispute was ever resolved.

gence would never have to repay any subrogated medical expenses.[10] *Id.* at 60. We now are of the opinion that our conclusion in *Sorge* was erroneous.

## The Made Whole Inquiry Today

¶ 34. We recognize that, in light of our decision in *Sorge*, the court of appeals below took a logical step by remanding for a determination of Michael Ives' contributory negligence. Although not explicitly directed by the court of appeals, the circuit court would necessarily have to determine the negligence of all of the alleged tortfeasors. The court of appeals also was compelled to rule on the applicability of the contributory negligence bar as contained in Wis. Stat. § 895.045. The Iveses' attorney vividly described the possible outcomes, based on prior case law:

> In this case, under the Court of Appeals ruling, Michael Ives'(sic) is made whole if he is found to be 82.58 percent or greater contributorily negligent.

---

[10] Justice Steinmetz' concurrence incorrectly asserts that the Wisconsin Academy of Trial Lawyers (WATL) proposed factoring in the plaintiff's contributory negligence when determining the made whole number. Steinmetz conc. at 88, n.4. WATL's proposal, referred to in footnote 4, is consistent with *Rimes* and *Garrity*: the settlement amount plus the insurers' payments equals the total amount of her losses, or the made whole number. Both Justice Steinmetz' concurrence and the opinion in *Sorge* misinterpret WATL's position. WATL's amicus brief in *Sorge* did not advocate a proration of the settlement recovery from the tortfeasors between plaintiff Sorge and her subrogated insurers. Rather, WATL merely suggested that any amounts the plaintiff recovered beyond her made whole number be divided between her *two insurers*. Brief of Amicus WATL at 8, *Sorge v. National Car Rental System, Inc.*, 182 Wis. 2d 52, 60 n.5, 512 N.W.2d 505 (1994).

So, at the "mini-trial," Rhinelander must focus on Michael Ives' contributory negligence and get a ruling of at least 82.58 percent of contributory negligence from the trial court in order to recover at all. If the trial court reaches that magic number, then Rhinelander recovers. Under the Court of Appeals formula, they would recover up to 17.42 percent of its total lien.

However, if Rhinelander does a somewhat better job in proving Michael Ives' negligence, and the trial court finds Michael Ives 90 percent negligent, Rhinelander recovers only 10 percent of its total lien. To take this a step further, if Rhinelander does the best job it can in proving Michael Ives' contributory negligence, and the trial court finds Michael Ives 100 percent negligent, Rhinelander gets nothing, just as it would have if Michael Ives had not been made whole.

Respondents' brief, at 12.

¶ 35. The parties before the court acknowledge the uncertain and unworkable status of the current law on subrogation reimbursement. They seek guidance so that the principles of earlier decisions may be properly applied, where possible, to pre-trial settlements.[11] Neither party seeks a trial on liability.[12] At oral argument, counsel for Rhinelander and the Iveses agreed that a full trial on liability would be unworkable, time-consuming, expensive and contrary to judicial economy.

---

[11] When we refer to a settlement by the parties here, we refer to a settlement between the injured plaintiff and *all* remaining tortfeasor defendants. In this concurrence, we do not address a settlement with fewer than all of the defendants.

[12] Nor did either party request a jury to hear the evidence offered at the post-settlement subrogation hearing.

¶ 36. To respond to the parties before us, we would return to traditional principles of subrogation. We give the doctrine of subrogation a liberal application. *D'Angelo v. Cornell Paperboard Products Co.*, 19 Wis. 2d 390, 402, 120 N.W.2d 70 (1963); *Perkins v. Worzala*, 31 Wis. 2d 634, 639, 143 N.W.2d 516 (1966). However, subrogation reimbursement will not be permitted where it works a result that is contrary to public policy. *First Nat. Bank of Columbus v. Hansen*, 84 Wis. 2d 422, 429, 267 N.W.2d 367 (1978). "Subrogation is based on equity and is permitted only when the rights of those seeking subrogation have greater equity than those who oppose it." 84 Wis. 2d at 429. As the court said in *Cunningham v. Metropolitan Life Ins. Co.*, 121 Wis. 2d 437, 455, 360 N.W.2d 33 (1985), we are not ready to dispose of our long standing doctrine of equitable subrogation. Here we would reaffirm the equitable principles which underlie the doctrine.[13]

¶ 37. The made whole principle has been characterized as the primary doctrine developed to alleviate the harshness of subrogation. Roger M. Baron, *Subrogation: A Pandora's Box Awaiting Closure*, 41 S. Dak. L. Rev. 237, 238 (1996). This court defined made whole in *Rimes* by saying that where there is a claim for either equitable or conventional subrogation, the insurer will not share in the recovery from the tortfeasor if the total amount recovered by the insured from the insurer and the wrongdoer does not cover his or her entire loss. 106 Wis. 2d at 271. After the plaintiff

---

[13] The made whole rule, requiring as it does case-by-case "satellite litigation" after the underlying action has been settled, has been criticized as counterproductive and as further diminishing the funds available to the injured insured for compensation. Roger M. Baron, *Subrogation: A Pandora's Box Awaiting Closure*, 41 S. Dak. L. Rev. 237, 251 (1996).

and defendants have settled, either the settling plaintiff or the subrogated insurer may request a *Rimes* hearing. At that hearing the circuit court will determine whether the injured plaintiff has been made whole, that is, whether the injured plaintiff has been fully compensated for the loss sustained.

¶ 38. We believe that the *Sorge* court failed to apply this formula, in part because the parties created a stipulated record that did not contain the plaintiff's total damage figure.[14] Nonetheless, the *Sorge* court proceeded to rule that the insurers were entitled to reimbursement because the insured had "received all that she was legally entitled to receive," without actually calculating her total damages. We would now vote to overrule our holding in *Sorge*. By doing so, we would preserve the requirement for a made whole determination before a subrogated insurer may be reimbursed.[15]

---

[14] It is appropriate to note at this juncture, as even counsel for the Iveses stated at oral argument here, that *Sorge* was a "set-up" case. The payments made by the insurers were quite small, and represented a very small portion of plaintiff Sorge's total damages, based on her ultimate settlement amount. It is clear that the parties, including the amicus in that case, were interested in a rule of law to apply to future cases. Unfortunately, at the time *Sorge* was decided this court did not envision the problems we now face in determining rights to subrogation reimbursement. The *Sorge* decision represented a fundamental change from our long-standing rule in *Rimes*, and in our view, is not tenable. Without performing the made whole calculation established in *Rimes*, the *Sorge* court erred by broadly stating that a contributorily negligent plaintiff could never be made whole.

[15] We take this view notwithstanding our recognition of appellate decisions that a statute may limit or preempt the common law made whole rule. *See, e.g., Waukesha County v. Johnson*, 107 Wis. 2d 155, 161–62, 320 N.W.2d 1 (Ct. App. 1982)

¶ 39. A majority of jurisdictions that still permit reimbursement to a subrogated carrier in personal injury actions adhere to the made whole rule of *Garrity* and *Rimes*.[16] *See, e.g., Powell v. Blue Cross & Blue Shield*, 581 So. 2d 772, 777 (Ala. 1990); *Marquez v. Prudential Property & Cas. Ins. Co.*, 620 P.2d 29, 32–33 (Colo. 1980) (interpreting statute to be consistent with insured-whole rule); *Magsipoc v. Larsen*, 639 So. 2d 1038, 1042 (Fla. Dist. Ct. App. 1994); *Hardware Dealers Mut. Fire Ins. Co. v. Ross*, 262 N.E.2d 618, 621 (Ill. App. Ct. 1970); *Capps v. Klebs*, 382 N.E.2d 947, 951 (Ind. Ct. App. 1978) (construing statute as intending to confer right of subrogation only in event the insured has been fully compensated for his or her adjudged losses); *Ludwig Farm Bureau Mut. Ins. Co.*, 393

(reimbursement formula set forth in Wis. Stat. § 49.65 (1977) rendered inapplicable common law rule and permitted counties to be reimbursed for medical assistance payments from the proceeds of automobile accident settlements despite the fact that the recipients had not been fully compensated); *Martinez v. Ashland Oil, Inc.*, 132 Wis. 2d 11, 15–16, 390 N.W.2d 71 (Ct. App. 1986) (distribution scheme in Wis. Stat. § 102.29 (1975) permitted a worker's compensation carrier to share in the settlement proceeds recovered from a third party by a wife and child of a worker killed in an industrial accident, even though the wife and child had not been made whole); *Petro v. D.W.G. Corp.*, 148 Wis. 2d 725, 727–28, 436 N.W.2d 875 (Ct. App. 1989) (by enacting Employee Retirement Income Security Act of 1974, Congress preempted state's subrogation law and proof that the injured person had been made whole not necessary for insurer's recovery from the settlement proceeds).

[16] *See* Roger M. Baron, *Subrogation: A Pandora's Box Awaiting Closure*, 41 S. Dak. L. Rev. 237, 250 (1996). *See also* collected cases in Elaine M. Rinaldi, *Apportionment of Recovery between Insured and Insurer in a Subrogation Case*, 29 Tort & Ins. L.J. 803, 807 (1994).

N.W.2d 143, 144–46 (Iowa 1986) (upholding made whole rule, but permitting subrogation reimbursement where amounts recovered by insured from tortfeasor can be identified and credited toward subrogated claims); *Southern Farm Bureau Cas. Ins. Co. v. Sonnier*, 406 So. 2d 178, 180 (La. 1981); *Wescott v. Allstate Ins. Co.*, 397 A.2d 156, 169 (Me. 1979); *Frost v. Porter Leasing Corp.*, 436 N.E.2d 387, 389–90 (Mass. 1982) (where insurance policy contained no subrogation clause, court unwilling to extend implied rights of subrogation to insurance for personal injuries); *Union Ins. Soc'y v. Consolidated Ice Co.*, 245 N.W. 563, 564, (Mich. 1932); *Westendorf v. Stasson*, 330 N.W.2d 699, 703 (Minn. 1983); *Home Ins. Co. v. Hartshorn*, 91 So. 1, 3 (Miss. 1922); *Skauge v. Mountain States Tel. & Tel. Co.*, 565 P.2d 628, 632 (Mont. 1977) (holding that insured is entitled to be made whole for his or her entire loss and any costs of recovery, including attorney fees, before insurer can assert its right of legal subrogation); *Providence Washington Ins. Co. v. Hogges*, 171 A.2d 120, 124 (N.J. Super. Ct. App. Div. 1961); *St. Paul Fire & Marine Ins. Co. v. W.P. Rose Supply Co.*, 198 S.E.2d 482, 484–85 (N.C. Ct. App.) *cert. denied*, 200 S.E.2d 655 (N.C. 1973); *Lombardi v. Merchants Mut. Ins. Co.* 429 A.2d 1290, 1292 (R.I. 1981); *Wimberly v. American Cas. Co. of Reading, Pa.*, 584 S.W.2d 200, 203 (Tenn. 1979); *Ortiz v. Great Southern Fire & Cas. Ins. Co.* 597 S.W.2d 342, 344 (Tex. 1980); *Hill v. State Farm Mut. Auto Ins. Co.*, 765 P.2d 864, 868 (Utah 1988); *Vermont Indus. Dev. Auth. v. Setze*, 600 A.2d 302, 307 (Vt. 1991); *Thiringer v. American Motors Ins. Co.*, 588 P.2d 191, 193–94 (Wash. 1978); *Kittle v. Icard*, 405 S.E.2d 456, 464 (W. Va. 1991).

¶ 40. We now believe that our decision in *Sorge*, while seemingly reasonable, misapplied the made

whole rule of *Garrity* and *Rimes*. Because the stipulation by the parties focused the court on what the plaintiff was legally entitled to receive, instead of focusing on what loss the plaintiff had actually sustained, none of the courts considering the issue addressed Ms. Sorge's total damages. Total damages, however, are the heart of the made whole determination. The focus of made whole is not on what the plaintiff can legally receive, but on what the plaintiff lost. *See, e.g., Rimes,* 106 Wis. 2d at 275:

> It is clear that a payment of [the settlement amount], unless that sum had been arrived at by a jury whose intent was to make the plaintiff whole, was irrelevant. Under the facts of this case, the payment. . .was the price that the defendant tortfeasors were willing to pay to avoid the risk of greater exposure; and it was the sum that [the injured plaintiff] was willing to accept. It has nothing to do with the determination of whether [the injured plaintiff] was made whole.

¶ 41. Therefore, we would overrule the holding of *Sorge* that a plaintiff is made whole when he or she receives all that he or she is legally entitled to receive taking into account his or her contributory negligence. Instead, we believe that reaffirming the made whole rule would restore consistency of results and lead to more prompt resolution of subrogation claims between an insured and his or her insurer.

¶ 42. Justice Steinmetz' concurrence asks "[o]f what value is precedent when a unanimous holding can be overruled two years later due to a change in the minds of members of this court?" Steinmetz conc. at 88. We answer by saying that it is now clear that *Sorge* misapplied 18 years of precedent by not correctly applying the made whole theory recognized in *Garrity*

and *Rimes*. Thus, it is indeed *Sorge* which changed existing precedent and which has created the problems now facing this court.

¶ 43. Justice Steinmetz' concurrence states that settlements should be encouraged. We agree. We disagree, however, with the implication that the made whole rule of *Garrity* and *Rimes* has worked to discourage settlements. Very few cases have come to this court in the past twenty years, other than *Sorge*, where the parties have asked us to interpret the *Garrity* and *Rimes* decisions. We can only assume that parties have successfully achieved settlements, applying the made whole principles of our earlier cases.

¶ 44. The made whole rule may best be explained by an example:

> A plaintiff has total damages of $60,000. That is the made whole number. The insurer has paid $40,000 in medical expenses on behalf of the plaintiff. The plaintiff settles with the tortfeasor for $30,000. Thus, the plaintiff has received, or received the benefit of, $70,000, or $10,000 over his or her made whole number. That excess $10,000 is available to reimburse the subrogated insurer.
>
> After that, the plaintiff will likely pay $10,000 in attorney's fees (1/3 of $30,000 settlement) and have $10,000 left over to pay costs of litigation, and as compensation for all of the other elements of damage for which the plaintiff was not insured.

¶ 45. Contrary to the position of Justice Steinmetz' concurrence, insureds may well settle for an amount which, when combined with the dollars already paid by the insurer, is in excess of the insured's total damages or made whole number. Justice Steinmetz' concurrence fears that our willingness to maintain the made whole rule of *Garrity* and *Rimes*

would work an injustice to insurers who seek subrogation reimbursement. This fear is misplaced. Were our analysis that of a majority, it would not allow insured plaintiffs to reap a new benefit. Simply put, we believe that the rule of *Garrity* and *Rimes* should remain. And, as we have noted earlier, the made whole rule is applied in a vast number of states permitting subrogation in personal injury actions.

¶ 46. Nonetheless, in place of the made whole rule Justice Steinmetz' concurrence would adopt Rhinelander's position and allow the insurer to recover a pro rata portion of the settlement proceeds from the insured, even when the sum of the subrogated payments and the settlement dollars does not equal the plaintiffs' total damages. Justice Steinmetz' concurrence offers no Wisconsin precedent for this proposal, a proposal which would effectively overrule *Garrity* and *Rimes*. Instead, the concurrence cites a bar journal article written 15 years ago, in which the author proposed to attorneys that they settle subrogation cases by executing a pro rata agreement with the insured.[17] Donald H. Piper, *The Garrity and Rimes Dilemma*, The Milwaukee Lawyer, October, 1982, at 3.

> [I]t is possible in an appropriate case for an insurer and its insured to enter into a binding agreement modifying the *Garrity-Rimes* rules for purposes of the specific lawsuit. . . .The essence of such a solution to the problem would be an agreement that the insured and the insurer would share pro rata in any recovery according to a negotiated percentage that reflects the amounts of the claims of both parties, the strengths and weaknesses of the

[17] At least as of the time he wrote this article, Mr. Piper's practice included representing insurers who have subrogation claims. Piper at 3.

plaintiff's noninsured claims, and the roles that both parties intend to play in prosecuting the litigation.

Attorney Piper's proposal was not directed at the courts, but at the parties to the subrogation dispute.[18]

¶ 47. Although not required by the facts of this case, Justice Steinmetz' concurrence also proposes a formula for sharing of attorney's fees between the insured and subrogated insurer. In that discussion, the concurrence relies again on the Piper article. While Justice Steinmetz' concurrence seeks to be "completely equitable," Steinmetz conc. at 92–93, it fails to recognize the varying degrees of participation by lawyers for subrogated insurers. In any given case, the insurer may have a lawyer who enters an appearance and does nothing, or who does little work and advances no costs, or who is substantially involved in the prosecution of the claim. Applying the suggestion of Justice Steinmetz' concurrence, under either of these three scenarios the insured plaintiff would have to bear the full amount of his or her attorney's fees and litigation costs.

¶ 48. In sum, Justice Steinmetz' concurrence proposes a fractured remedy for subrogation claims. Under that proposal, resolution of a claim for subrogation will depend upon whether there is a trial finding of contributory negligence, a stipulation as to gross dam-

---

[18] It is interesting to note that Mr. Piper is one of the authors of the publication, *The Law of Damages in Wisconsin*, (State Bar of Wisconsin CLE Books, 2d ed. 1995). Sec. 32.20 of that volume sets out the made whole rule of *Garrity v. Rural Mutual Ins. Co.*, 77 Wis. 2d 537, 253 N.W.2d 512 (1977) and *Rimes v. State Farm Mut. Auto Ins. Co.*, 106 Wis. 2d 263, 316 N.W.2d 348 (1982).

ages and contributory negligence,[19] or a settlement without such stipulations. Our position is simple—only one rule should apply. The made whole rule as set out in *Garrity* and *Rimes*, and as applied in subsequent case law, best meets the equitable and legal principles behind subrogation and should apply to each of the situations addressed herein.

¶ 48a. I am authorized to state that Chief Justice Shirley S. Abrahamson and Justice William A. Bablitch join this concurring opinion.

¶ 49. DONALD W. STEINMETZ, J. (*concurring.*) This concurring opinion and the one of Justice Geske result from a 3–3 vote on the merits of the case. I would reverse the court of appeals decision.

¶ 50. The origin of the theory of "made whole" for an insured in Wisconsin can be traced back to *Essock v. Mawhinney*, 3 Wis. 2d 258, 88 N.W.2d 659 (1958). *Essock* had nothing to do with liability and attending subrogation of an insurance company; rather, *Essock* was a case dealing with a mortgage. The suit was against an auctioneer for negligence. The court held the auctioneer liable for negligence in conducting a sale, which resulted in delay and departure of prospective buyers, on the ground of probability that prices obtained were reduced. The circuit court also considered the negligence of the loan company in rendering its decision.

¶ 51. The closest the *Essock* case came to the current made whole theory was the jury being satisfied that the $10,700 payment was accepted upon the Mawhinneys' indebtedness and not as payment in full.

---

[19] We doubt that the parties will stipulate to gross damages and contributory negligence with any frequency.

The court held that "[s]ince the Mawhinneys are to be made whole by the granting to them of damages suffered, it follows that the Loan Company is entitled to credits for its commission and to the amount which it will have paid to plaintiffs in excess of the sale proceeds." *Id.* At 272. From this case, where the concept of being made whole had nothing to do with subrogation, it is a far leap to *Garrity v. Rural Mut. Ins. Co.*, 77 Wis. 2d 537, 253 N.W.2d 512 (1977), a case upon which Justice Geske's concurring opinion in the present case relies heavily.

¶ 52. Without precedent, in *Garrity*, 77 Wis. 2d at 538, this court held "the insured is entitled to be made whole before the insurer may share in the amount recoverable from the tort-feasor."[1] This was a new and substantial holding as to subrogation without any basis in Wisconsin law. The *Garrity* court repeats this holding twice again without precedent. *Id.* at 540. Thus, a giant step was invented by this court, changing

---

[1] See Judge Posner's discussion contrasting the economic merits of applying the make whole interpretive principle versus utilizing a subrogation clause in *Cutting v. Jerome Foods, Inc.*, 993 F.2d 1293, 1297–99 (7th Cir. 1993), *cert. denied*, 510 U.S. 916 (1993) ("It is true that rejecting 'make whole' would bring subrogation closer to assignment, but that would not necessarily be a bad thing. Assignment, by shifting the insured's tort rights to the insurance company, reduces the price of insurance and thus enables the insured to obtain more coverage, in effect trading an uncertain bundle of tort rights for a larger certain right, which is just the sort of trade that people seek through insurance."). Judge Posner also noted another drawback to perpetuating the make whole rule: "[it] simply shifts the disincentive to press hard (for a higher recovery from the tortfeasor) from the insurer to the insured." *Cutting*, 993 F.2d 1293, 1298.

the law of subrogation and ignoring existing insurance contracts.

¶ 53. In *Garrity*, this court relied on *Hammill v. Kuchler*, 203 Wis. 414, 232 N.W. 877, 234 N.W. 879 (1931), a case involving a mortgage and a warranty deed. The court discussed subrogation: " 'Subrogation is based on rules of equity. It is a creation of the law whereby the substantial ends of justice may be accomplished regardless of contract relations.' " *Hammill*, 203 Wis. at 425 (citation omitted). The case did not deal with the concept of being made whole.

¶ 54. In declining to apply the doctrine of subrogation to the situation, the court in *Hammill* noted: "The general rule is that a person is not entitled to be subrogated to a creditor's securities until the claim of the creditor against the debtor to secure which the securities were given has been paid in full. . . ." *Id.* at 426, quoting 25 Ruling Case Law at 1318. This is not a valid basis to support the holding in *Garrity* which allows courts to ignore existing insurance contracts under the guise of the "common law."

¶ 55. In *Rimes v. State Farm Mut. Auto. Ins. Co.*, 106 Wis. 2d 263, 316 N.W.2d 348 (1982), this court reluctantly found that the only way the amount of Palmer and Patricia Rimes' damages could be ascertained was through a post-settlement trial. The *Rimes* court concluded that the amount of the insured's losses can best be established through a trial or hearing. This court further held in *Rimes* that the cause of action against a tortfeasor is indivisible. "Accordingly, it is only when there has been full compensation for all the damage elements of the entire cause of action that the insured is made whole."[2] *Id.* at 275. At the mini-trial in

---

[2] Justice Geske's concurrence notes that the made whole rule of *Rimes v. State Farm Mut. Ins. Co.*, 106 Wis. 2d 263, 316

*Rimes,* the trial court determined the plaintiff's total loss. It also considered contributory negligence, and determined that Rimes did not negligently contribute to his loss. *Id.* at 268. However, determining this requires establishing the nebulous "damages elements," as further explained below.

¶ 56. Only two years ago in *Sorge v. National Car Rental System, Inc.,* 182 Wis. 2d 52, 57, 512 N.W.2d 505 (1994), the petitioner advanced the following argument:

> [A]n injured party is made whole when she receives compensation for all her losses. The settlement in this case did not compensate Sorge for all of her losses because her recovery was reduced by an amount corresponding to her contributory negligence. Sorge claims, therefore, that the settlement did not make her whole.

*Sorge,* 182 Wis. 2d at 57. The court unanimously rejected this theory which Justice Geske's concurrence now embraces.

¶ 57. Instead, in *Sorge* the court unanimously adopted the respondent's argument that "an injured party is made whole when she receives the amount of compensation she would be *legally* entitled to recover from a trial in which the jury awarded her damages and the court reduced the damage award to account for

---

N.W.2d 348 (1982), has become the default rule in the Seventh Circuit "where an employee benefit plan fails to designate priority rules or provide its fiduciaries the discretion necessary to construe the plan accordingly." Concurring op. at 70, note 8 (citations omitted). However, the concurrence neglects to note that another Seventh Circuit decision, *Cutting v. Jerome Foods, Inc.,* 993 F.2d 1293 (7th Cir. 1993), *cert. denied,* 510 U.S. 916 (1993), pointed out that the make whole rule of *Rimes* is not "universal," and may not even be "predominant." *Id.,* at 1297.

the injured party's contributory negligence pursuant to Wis. Stat. § 895.045." (Emphasis added.) *Id.*[3] In *Sorge* even the amicus curiae brief of the Wisconsin Academy of Trial Lawyers (WATL) allowed for consideration of contributory negligence of the injured party in the made whole formula. *Id.* at 60, n. 5. WATL further argued that a pro rata formula should be applied to determine the rights of the parties. *Id.*[4] The holding in *Sorge* that a plaintiff is made whole by a settlement covering his or her losses less the amount corresponding to his or her contributory negligence is now plainly ignored by Justice Geske's concurrence.

¶ 58. Of what value is precedent when a unanimous holding can be overruled two years later due to a change in the minds of members of this court? For persons writing insurance contracts, there is no precedent. Justice Geske's concurring opinion in this case contributes to the charge that there is no certainty in

---

[3] All that a person is ever legally entitled to receive is his or her total damages less a deduction for contributory negligence. A plaintiff is not legally entitled to receive an amount that does not consider his or her contributory negligence.

[4] WATL's position was explained in *Sorge* as follows:

Amicus curiae, the Wisconsin Academy of Trial Lawyers (WATL), advances a position similar to Sorge's.

However, WATL avoids this incentive problem by acknowledging that a contributorily negligent party could be made whole, or even more than whole, if the combination of the settlement and her own insurers' payments is equal to or greater than the total amount of her losses. In this situation, WATL suggests that the subrogated insurers would be entitled to recover a pro rata share of that portion of the injured party's recovery that is beyond her total losses. . . .

*Sorge*, 182 Wis. 2d at 60, n. 5. In the case at hand, *Ives v. Coopertools*, amicus curiae, the Wisconsin Health Insurers, also advocate a position similar to that of WATL in *Sorge*, also suggesting the use of a pro rata formula. Amicus curiae at 8.

the law, because the law can change with the whims of the majority.

¶ 59. Justice Geske's concurrence is further flawed in that it fails to recognize the difference between damages awarded as a result of a trial and damages awarded as the result of a settlement. Settlement does not establish value of the plaintiff's loss; but rather, it is a compromise, a coming together of minds considering the potential award after a trial to a court or jury. This involves the consideration of many factors such as the insured's contributory negligence, time before trial, attorney fees, attorney's ability, availability of witnesses and their credibility, and the potential and time for recovery. However, the value of the insured's claim considering the pain and suffering can only be established by trial by a judge or a jury, or a post-settlement hearing. Therefore, to say subrogation is available only after the insured has recovered all his or her losses from his or her own insurance company and the tortfeasor is incorrect.

¶ 60. Under the theory advanced by Justice Geske's concurrence, the insured is not made whole until all of his or her losses have been recovered. *See* concurring op. at 66. The insured will rarely or never receive in excess of his or her losses because it is unlikely the insured will be paid more than the value of losses that include damages such as pain and suffering, lost past and future wages, embarrassment, disability, loss of consortium. Consequently, the concurring opinion of Justice Geske effectively kills all future subrogation claims by a subrogated insurer.

¶ 61. In addition, the concurrence allows the plaintiff to reduce or eliminate reimbursement to a subrogated insurer in at least two ways. First, the injured plaintiff can settle with the alleged tortfeasors,

thereby extinguishing the subrogated insurer's right of action against the tortfeasor. *Schulte v. Frazin*, 176 Wis. 2d 622, 634–35, 500 N.W.2d 305 (1993). Second, the plaintiff can settle with the tortfeasor for a little less than his or her total damages and then claim to have not been made whole or compensated for all of the elements of damages. *Rimes*, 106 Wis. 2d at 275.

¶ 62. Despite its potential downfalls, settlement should be encouraged by this court. It provides the parties with a fair, more rapid solution to their dispute than does a trial. The parties also often reach a settlement to avoid the expense and headaches of a drawn-out trial, and many of the factors that affect the outcome of a trial are taken into consideration by the parties in reaching the agreement, including the contributory negligence of the parties. However, there are still differences between settlements and trials that should be considered in determining a subrogated insurer's rights.

¶ 63. Based on the precedent of *Rimes* as spelled out by *Sorge*, then, if a case goes to trial, a plaintiff's contributory negligence as determined by a jury is a factor in determining if a plaintiff has been made whole.[5] *Sorge* should also be applied in a settlement situation if the parties have stipulated to the plaintiff's gross damages and to the plaintiff's contributory negligence.[6] If, on the other hand, a case settles and there have been no stipulations to a plaintiff's gross damages and contributory negligence, then fairness and equity

---

[5] This statement assumes that the trial court has not exercised its additur or remittitur power. Because this situation is not before this court, we decline to discuss this possibility.

[6] It is important to note that the parties in *Sorge* stipulated to the plaintiff's contributory negligence in reaching a settlement.

require that the court assess the subrogated insurer's rights of recovery at a rate equal to the percentage of the plaintiff's recovery in relation to his or her gross damages.

¶ 64. This pro rata recovery in such a settlement situation is a fair and equitable solution because to require a post-settlement hearing to determine contributory negligence defeats the purpose of settlement, since contributory negligence of the plaintiff is generally a factor that is considered by the parties in reaching an agreement. As Justice Geske's concurring opinion notes, this approach, as embraced by the court of appeals, could open the door to manipulation by the plaintiff:

> In this case, under the Court of Appeals ruling, Michael Ives'(sic) is made whole if he is found to be 82.58 percent or greater contributorily negligent. So, at the "mini- trial," Rhinelander must focus on Michael Ives' contributory negligence and get a ruling of at least 82.58 percent of contributory negligence from the trial court in order to recover at all. If the trial court reaches that magic number, then Rhinelander recovers. Under the Court of Appeals formula, they would recover up to 17.42 percent of its total lien.

Concurring op. at 74–75, *citing* Respondents' brief, at 12. Consequently, the pro rata solution works best in such a situation.

¶ 65. Justice Geske's concurrence seeks to "reaffirm" the rules set forth in *Garrity* and *Rimes* while overruling its recent unanimous decision in *Sorge*. Concurring op. at 81. However, the concurring opinion overlooks the fact that the *Garrity* rule was merely invented by the court and had no basis in precedent, and the *Rimes* decision was reached through reliance

on this tenuous *Garrity* rule. The concurrence of Justice Geske is based on shaky precedent, at best. It serves to effectively destroy all subrogation claims because, under its reasoning, a plaintiff will rarely be "made whole" because he or she will not likely ever recover in excess of his or her losses if all factors are considered.

¶ 66. The better decision would be that circuit courts need not determine whether a plaintiff has been made whole by a settlement. Instead, a circuit court should only need to determine the amount of the plaintiff's gross damages and apply a pro rata formula to determine the amount, if any, of the subrogated insurer's recovery.[7]

¶ 67. In order for our solution to be completely equitable, attorney fees should be considered by the trial court in certain circumstances. There are arrangements in subrogation cases that may burden the

---

[7] The best way to demonstrate how this formula would work is through an example. A plaintiff has total damages of **$100,000**. The insurer has paid medical expenses of **$20,000**. The plaintiff settles with the defendants for **$75,000**. Under the formula advanced in this concurrence, because the plaintiff has settled for 75% of his or her total damages, the insurer is entitled to receive 75% of its subrogated amount, or **$15,000**.

Under the theory advanced by Justice Geske's concurring opinion, the court will first determine at what amount the plaintiff is made whole. That amount is **$100,000**. The plaintiff has received, in total, **$95,000**, including the **$20,000** in medical expenses paid by the insurer and the **$75,000** settlement. Under the theory of the concurrence, then, the plaintiff has not been made whole, so the subrogated insurer is not entitled to receive any of the reimbursement it has contracted for. This will be the case, under the concurring opinion, even if the plaintiff is 100% contributorily negligent. In that case, Justice Geske's concurrence would allow the plaintiff a **$95,000** windfall.

subrogated insurer. Such a situation is described as follows:

> In those cases in which the loss payment of the insurer is large enough to warrant a subrogation effort, it is the insurer who most often conducts the bulk of the investigation to marshal sufficient evidence to proceed against the wrongdoer, for example, by engaging and paying for experts and complicated testing in products liability cases. Under these circumstances, the insured, regardless of whether his claim of uninsured damages is reasonable or unreasonable, often secures the equivalent of a "free ride."

Donald H. Piper, *The Garrity and Rimes Dilemma*, The Milwaukee Lawyer, October 1982, at 3, 4. Occasionally, the plaintiff may bear the bulk of the expenses and attorney fees, and often, both the plaintiff and the subrogated insurer will employ counsel on their own. For example, in the case at bar, both the Iveses and Rhinelander employed counsel to represent their interests. *See* concurring op. at 59–60. In such a case where both the plaintiff and the subrogated insurer have employed their own attorneys, attorney fees and costs should not be considered in applying the pro rata formula explained here. However, if the insurance company relies on the insured's attorney and does not hire its own attorney, then the attorney fees and costs should be paid by both the insured and his or her insurer, each paying 50% of the attorney fees and costs.[8] "Such case-by case analysis is. . .consistent with the equitable

---

[8] The attorney for the Ives argued that Rhinelander's proposed rule is only fair if the subrogated insurer also shares in the attorney fees and costs. Respondent's brief at 23.

underpinnings of the doctrine of subrogation." Piper, *supra* at 5.

¶ 68. I would reverse the decision of the court of appeals and remand with directions to apply the principles of this concurrence. Full or gross damages are at the heart of the equation. I would therefore hold that by accepting the settlement, which includes medical expenses paid by Rhinelander, the Iveses must reimburse Rhinelander its pro rata share of the settlement recovery. Because the Iveses settled for 17.42 percent of their stipulated gross damages, the result in this case would be to award Rhinelander 17.42 percent of the subrogated amount. Such a decision would return some certainty to subrogation law with an easy pro rata formula. Additionally, such a decision would be grounded on the traditional principles of equity and fairness that underlie the subrogation doctrine as embraced by this court in *Sorge.*

¶ 69. I would reverse the decision of the court of appeals for the reasons stated herein which are contrary to the reasoning of Justice Geske's concurrence and remand with instructions to apply the principles embraced by this concurrence.

¶ 69a. I am authorized to state that JUSTICES Jon P. Wilcox and N. Patrick Crooks join this concurring opinion.